# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

|                              |   |                          |
|------------------------------|---|--------------------------|
| IN RE                        | ) |                          |
|                              | ) | Case No. 09-00315-TLM    |
| **RODNEY LOWE SCHIEMER,**    | ) |                          |
|                              | ) | Chapter 12               |
|                              | ) |                          |
| Debtor.                      | ) |                          |
| _____    | ) |                          |

## MEMORANDUM OF DECISION
_____

Before the Court is a stay relief request under § 362(d) in this Chapter 12 case.[1]  Upon the record and the evidence at hearing held March 11, 2009, the Court determines that the request should be granted, in part, and the balance of the matter continued for further hearing.  These are the Court's findings of fact and conclusions of law.  Fed. R. Bankr. P. 7052, 9014.

**FACTS**

Rodney Schiemer ("Debtor") is a farmer in Malheur County, Oregon.[2]  For many years, he has farmed with financing from Northwest Farm Credit Services ("Farm Credit").  That relationship commenced in 2002.  The Farm Credit loans at

_____

[1]  Unless otherwise indicated, all citations to chapter or section are to the Bankruptcy Code, Title 11, U.S. Code, §§ 101-1532.

[2]  The Bankruptcy Court for the District of Idaho has concurrent jurisdiction with the Bankruptcy Court for the District of Oregon over bankruptcy cases arising in Malheur County. *See In re Vansickle*, 350 B.R. 897 n.1, 06.2 I.B.C.R. 22 n.1 (Bankr. D. Idaho 2006).

MEMORANDUM OF DECISION - 1

issue were subject to 90% guarantees by the U. S. Department of Agriculture, Farm Services Agency ("FSA").

Debtor owned the "Riverview" or "River Farm" parcel (approximately 40 acres) free and clear of liens.[3]  In 2002, Debtor purchased the "Booth" parcel (approximately 103 acres) through a Farm Credit loan (Loan #441).  Both the Booth parcel and the Riverview parcel were collateral for this loan under a deed of trust.  Ex. 8.  Debtor also farmed leased ground.

Debtor obtained several other loans through Farm Credit, including an operating or production loan for his 2004 crop year (Loan #141) and a loan for the acquisition of machinery.

### A.    The 2005 agreements

Debtor had setbacks and suffered operating losses in 2004.  Debtor's loans were transferred from Farm Credit's Ontario, Oregon office to its "Credit Division" that handled what were considered to be troubled or special credits.  Even though Debtor reduced the outstanding balance of the Farm Credit loans through sales of equipment and other assets, the balance was still over Farm Credit's lending limits and guidelines, and Farm Credit could not finance the coming year's operations.

An arrangement was reached between Debtor and Farm Credit in 2005.  A

---

[3]  Farm Credit's briefing suggests it was gifted to Debtor by his parents.

MEMORANDUM OF DECISION - 2

May 2, 2005 letter, with attachments, summarized the terms of the agreement. *See*

Ex. 5. Farm Credit would lend $283,000 for 2005 operations (Loan # 144) with a

maturity date in 10 months (March 1, 2006), and this amount was subject to a 90%

FSA guarantee. Prior to closing, Debtor would pay down the outstanding 2004

financing, Loan #141, to $530,000 (and it would be termed out over 5 years)[4] and

Debtor would pay off two other Farm Credit loans (#143 and #241). All Farm

Credit loans, including the reduced balance on Loan #141 and the balance on Loan

#144, could total no more than $813,000, which was the then-maximum amount

available while still maintaining the FSA guarantee.

These Farm Credit loans would be secured by crops and crop proceeds, and

by a "second lien" on both the Booth and Riverview parcels, subject only to the

prior Farm Credit obligations. The real estate loan, Loan #441, would be assumed

by Debtor's parent's, George and Melda Schiemer (the "Schiemers"), and Debtor

would be released from liability on that obligation.[5] This would enable Debtor to

reduce the total amount borrowed to below the FSA guarantee ceiling. The letter

also stated:

> Customer [Debtor] acknowledges that [Farm Credit] has determined
> that even if this budget performs as projected, that future financing may
> not be able to be continued. This new operating loan is being approved

---

[4] Loan # 141 would thereafter also be known as the "carryover" loan.

[5] George Schiemer testified that he ceased farming in 2001, and Debtor took over
farming operations.

MEMORANDUM OF DECISION - 3

to allow the Customer an opportunity to finish the 2005 crop and maximize the repayment on all loans.

Customer acknowledges that an assessment of the progress of this plan will be made in 10/05 to decide whether a total liquidation will be needed to collect the balance of all loans.  If liquidation is needed, an auction will be scheduled no later than 3/1/06.

*Id.*  Debtor endorsed this letter on June 14, 2005 as "Understood and Agreed to."

*Id.*

To accomplish this restructuring, Debtor and the Schiemers entered into an Assumption Agreement with Farm Credit dated June 14, 2005.  Ex. 9.  It reflected that Loan #441 was current as of that date, with an outstanding balance of approximately $126,000, the next payment being due in February, 2006.[6]  The Schiemers assumed that obligation, and Debtor was released from personal liability on Loan #441.  However, it provided that:

The Deed of Trust encumbering Rodney L. Schiemer's real property, however, will continue to secure the loan.

*Id.*[7]  This understanding was later reiterated:

Release of Personal Liability and Acknowledgment of Continued Enforceability of Deed of Trust.  Rodney L. Schiemer further acknowledges and agrees that contemporaneously with the execution of this Assumption Agreement, Rodney L. Schiemer is released from personal liability on the Loan [#441], but that the Deed of Trust . . .

---

[6]  The original note in 2002 was for $134,000 on a 20 year term, and it was secured by a deed of trust recorded in February, 2002.  Exs. 7, 8.

[7]  This was a reference to the first deed of trust on the Riverview and Booth parcels, Ex. 8.

MEMORANDUM OF DECISION - 4

continues to secure the Loan and may be enforced in accordance with its terms notwithstanding the release of his personal liability on the Loan.

*Id.*  The Assumption Agreement was executed by Debtor and the Schiemers.

Pursuant to the parties' agreement, Farm Credit terminated Debtor's liability on Loan #441 which reduced Debtor's aggregate obligations to Farm Credit and freed up lending under the FSA limits.  Ex. 10.  Farm Credit then granted Debtor the $283,000 loan (Loan #144) for 2005 crop production.[8]  On June 14, 2005, Debtor executed a deed of trust securing this $283,000 obligation and the carryover obligation under Loan #141.  Ex. 6.[9]  It encumbered the Booth and Riverview parcels and the irrigation equipment thereon.  It was recorded at 3:51 p.m. on June 15, 2005, as Instrument No. 2005-4345.

Immediately thereafter, at 3:55 p.m. on June 15, 2005, a warranty deed from Debtor to the Schiemers conveying the same real property was recorded as Instrument No. 2005-4346.  Ex. 101.[10]

George Schiemer testified that he assumed Farm Credit prepared the warranty deed and had it executed, because it all occurred as part of the same 2005

---

[8]  *See* Ex. 5.  This loan was guaranteed by FSA.  *See* Ex. 11.

[9]  The reference in the deed of trust, Ex. 6, is to a 2002 "principal amount" of $625,000. The Court understands that this was reduced to a balance of approximately $530,000 as part of the 2005 agreement, given other payments applied.

[10]  Ex. 12 is a copy of this same deed.

MEMORANDUM OF DECISION - 5

transaction. Debtor testified that he believed that this transfer of the real estate to his parents, and the warranty deed accompanying that transfer, were required by Farm Credit, but admitted he could not clearly recall that to be the case. He indicated during examination that he signed the deed to his parents at a title company office, but signed the deed of trust at the Farm Credit offices.

The Credit Division manager for Farm Credit, Richard Guenther, testified that Farm Credit did not require the transfer of the real property from Debtor to his parents, but at some point Farm Credit was informed by Debtor that he was considering the transfer. According to Guenther, Farm Credit did not object to that transfer, so long as the Assumption Agreement and the execution and recordation of the 2005 "second" deed of trust, Ex. 6, preceded any such transfer. Guenther stated that Farm Credit did not prepare the warranty deed or cause it to be prepared or recorded.

Debtor and Farm Credit disagree on another subject. Farm Credit indicates that it issued to Debtor in 2005 a "distressed loan letter" under the provisions of the Agricultural Credit Act of 1987. Guenther testified that he believed such a letter was issued in March, 2005. Debtor testified that he received no such letter in 2005.

Following the 2005 agreements, Debtor continued to farm the properties, but he did not make any "lease" payments to his parents. However, Debtor

MEMORANDUM OF DECISION - 6

indicates that he continued to pay personally the Farm Credit debt that had been assumed by his parents, the debt on the irrigation pivots, and the real estate taxes.

In 2005, Debtor's onion crop was infected by a virus and he had poor yields.  Other farmers also had poor yields, and consequently the open market for onions was good.  Unfortunately, Debtor had previously contracted to sell his onions, and he could not realize the higher open market prices.  Still, according to Guenther, Debtor managed to pay off the operating loan for that year, and Farm Credit agreed to finance Debtor for the 2006 crop season.

The problem with low yields continued in 2006.  Debtor diversified with sugar beet production that year, and made several expenditures for the equipment needed for that crop.  Farm Credit characterizes those as unauthorized capital expenditures and indicates that, but for those expenditures, Debtor may have been able to break even.

Coming out of the 2006 season, Farm Credit agreed to finance the 2007 crop season with a production loan (Loan # 146), and added $100,000 to the carryover loan (Loan # 141) to retire some debt of Debtor to another party.  The 2007 financing was on the same cross-collateralized basis as before, with FSA continuing to guarantee the loans.

Farm Credit characterized Debtor's 2007 season as a "disaster."  Debtor did not want to contract for delivery of onions above his 2006 yields.  Farm Credit

MEMORANDUM OF DECISION - 7

indicated he subcontracted his contracts to other farmers, something Debtor alluded to in his testimony. The open market price for 2007 onions was about the same as the cost of packing, and Guenther indicated many farmers simply plowed their onions under rather than pack and sell them.

Debtor for the most part agreed with the dismal characterization of 2007. He also indicated that he had problems with several of his contracts. These included a breach of contract by one of the purchasers, causing Debtor a $48,000 loss, another contract purchaser "skipping town" resulting in a $62,000 loss, and a third contract purchaser going bankrupt, causing a $14,000 loss. All told, these left Debtor unpaid by $124,000 on his preseason contracts. At the same time, Debtor had to cover the subcontracting agreements he had entered into with other farmers. Further, because the open market price was so low, Debtor had no way to realize profit on his uncontracted crop.

### B.    The 2008 agreements

Debtor could not make payments to reduce the principal on the production loan for that year or pay down the carryover loan. Guenther indicated that Farm Credit was left with an unpaid $475,000 operating loan (Loan # 146), and no payments toward the carryover loan (Loan # 141).

Debtor sent an e-mail to Guenther on February 5, 2008. Ex. 17. In this detailed, multi-page letter, Debtor first acknowledged the setbacks. He noted that

MEMORANDUM OF DECISION - 8

he owed a collective $900,000 in loans to Farm Credit.  He recognized that "when we talked two weeks ago you [Guenther] said I had to pay off the 2007 operating loan in order to have a chance to go another year and since that is probably not going to happen, all other options need to be explored."

Debtor then listed what he called "ideas . . . for us to discuss."  The first was a total liquidation of farming operations, with an auction of assets and a renting of real property, and Debtor moving to town and obtaining other employment.  Debtor inquired if there was enough value in the collateral to fully pay Farm Credit and, if not, if the FSA guarantees would cover the balance. Debtor stated:

> I guess I don't have to tell you how much plan #1 gives me a sick feeling in my stomach and I want to make sure we have exhausted all other options before we go forward with this plan.

*Id.*  Debtor then laid out three other proposals or scenarios in significant detail including the nature of possible operations, possible production and yields, and amounts that might be generated for application to the outstanding obligations.  He closed by stating:

> I know plan #1 is probably the only one that takes care of 2007 operating loan but I hope a combination [of] 2, 3, or 4 will keep us in business.  I'm sure you don't want to see #1 either since I must be one of your top customers, but I understand you have rules you have to follow too.  As soon as you have had a chance to look this over and think about it, let me know which direction I need to go.

*Id.*

MEMORANDUM OF DECISION - 9

Guenther responded by an e-mail on February 6. *Id.* He and Debtor met
the following day, commencing an ongoing series of meetings and telephone calls.

Guenther indicated that, from Farm Credit's viewpoint, the discussions
failed to result in any viable options for continuing production financing. Debtor
concurred, though he testified that he saw Guenther as essentially focused on
liquidation from the start.

On March 5, 2008, Farm Credit sent Debtor a "distressed loan letter"
signed by Guenther. *See* Ex. 106. Debtor admits receiving it. It stated, in part, as
follows:

> This letter is to inform you that, based upon all information in Lender's
> records, Lender has determined that the above referenced loan is a
> distressed loan pursuant to the Agricultural Credit Act of 1987. Your
> loan may be suitable for restructuring pursuant to the restructuring
> policy attached hereto. We have also included the forms necessary to
> complete and submit an application for restructuring.
>
> In order for Lender to evaluate your application for restructuring, you
> must complete and submit the following:
>
> 1.   Application for Loan Restructuring, ACA 1551 signed by all
>      customers liable for repayment of the loan, all guarantors and all
>      persons who signed a security document (mortgage, deed of
>      trust, security agreement, etc.);
>
> 2.   A proposed preliminary restructuring plan, which may be
>      included as part of the information on your restructure
>      application and farm plan[.]

MEMORANDUM OF DECISION - 10

*Id.*[11]  The referenced form, Application for Loan Restructuring, ACA 1551, was

attached, as was the "distressed loan restructuring policy" (ACA 1180).[12]  The

letter contains an admonition that Debtor act promptly, and that if Farm Credit

"[has] not received a completed application . . . together with **all** of the supporting

data specified above within 45 days of the date of this latter, [Farm Credit] will

initiate actions to collect this loan."  *Id.*  It concluded with Guenther indicating

that:

> In a few days, I will contact you to arrange a time to meet to discuss
> your loan and financial condition and to answer any questions you may
> have concerning the suitability of your loan for restructuring or the
> restructuring policy.

*Id.*

Both Debtor and Guenther agree that meetings soon occurred.  According

to Guenther, the discussions ended up focusing on liquidation, but under certain

conditions requested by Debtor.  Those conditions included Debtor finishing out

the 2008 crop; selling the real estate, or deeding it back to Farm Credit with an

option for Debtor or the Schiemers to repurchase; conveying Debtor's machinery

---

[11]  The letter required submission of financial, tax, and other documents in subsequent
numbered paragraphs 3 through 7.

[12]  That policy expressly defines "application for restructuring" as a written request from
a customer for the restructuring of a distressed loan in accordance with a preliminary
restructuring plan proposed by the customer as part of the application.  The written request must
be (1) submitted on the appropriate forms prescribed by the lender, and (2) accompanied by
sufficient financial information and repayment projections as required by the lender to support a
sound credit decision.

MEMORANDUM OF DECISION - 11

over to Farm Credit after the 2008 season, but selling unneeded equipment

immediately; and agreeing to pay Farm Credit $100,000 from the 2008 crop in

return for its agreement to release 2008 crop proceeds from its lien.  Guenther

testified that Debtor never submitted an application for restructuring under the

terms and conditions of the distressed loan letter.

Debtor agrees that he never submitted such an application.[13]  He testified

that he believed there was no purpose or function to the application required under

the letter and the appended ACA policy, because he had already made "proposals"

in his February e-mail, Ex. 17, and felt that those suggestions, the documents he

had provided, and the meetings he had with Guenther were the "equivalent" of an

application.  Furthermore, he stated that his lack of application was because it

appeared clear to him from and after the February 7 meeting with Guenther that

Farm Credit was interested only in finding a way to recover on the outstanding

debt through some sort of liquidation.

The ongoing discussions over 2008 led to an agreement and, ultimately, a

series of documents.

On July 10, 2008, Farm Credit sent a letter to Debtor outlining the nature of

the proposed agreement.  Ex. 13.  It was revised following an August 21, 2008,

---

[13]  Oddly, a subsequent letter agreement between the parties, Ex. 14 (discussed more
fully *infra*) refers to an "original" Application for Loan Restructuring from Debtor dated March
14, 2008, which was "withdrawn" as a part of the 2008 agreement.  *Id.* at 2 (¶ 11).

MEMORANDUM OF DECISION - 12

meeting.  On August 22, 2008, a letter of understanding from Farm Credit was

executed by Debtor and the Schiemers.[14]  Ex. 14.  It provided, among other things:

1.    Farm Credit would release its lien on the proceeds of the 2007 crop
so those proceeds could be used to pay other liens and expenses and
deliver the balance of that crop.

2.    Farm Credit would release the proceeds of the 2008 crop so they
could also be used to pay other liens and expenses under the 2008
budget, though "remaining" crop proceeds up to $100,000 would
remain as security for Farm Credit.

3.    Debtor would pay Farm Credit $100,000 from the 2008 crop on or
before March 1, 2009.  After such payment, Farm Credit would
release any further lien on Debtor's crops.

4.    Debtor would "deed" all real estate and machinery, vehicles and
irrigation equipment to Farm Credit "and waive Borrowers Rights
under the Ag Credit Act of 1987."  The real estate was to be free and
clear of liens (other than those to Farm Credit) and the machinery
subject only to purchase money liens.  Debtor's loans would be
credited with the "net recovery value" of all the security being

---

[14]  Debtor testified that he negotiated revisions to the July draft agreement in order to give himself more time in which to see if he could propose a restructure.

MEMORANDUM OF DECISION - 13

deeded over.  And: "As the real estate is now vested in the names of George & Melda Schiemer, it will be necessary to get their approval of this plan."

5.      The balance of the debt after credit for the real estate and machinery would be reamortized at 0% interest, with annual payments of at least $50,000 due March 1, 2010 and thereafter until paid.

6.      Debtor (or his assigns) would be allowed an option to purchase the real estate or machinery at market or appraised value.  By handwritten insertion, the option date on the real estate was extended from October 1, 2008 to December 1, 2008, and the option date on the machinery was set at March 1, 2009.[15]

7.      Farm Credit would allow Debtor to harvest the 2008 crop from the surrendered real estate and, should the option to repurchase not be exercised and should Farm Credit sell the property, the sale would be subject to this right to harvest.

8.      Farm Credit would allow Debtor to use the machinery until March 1,

---

[15]   Guenther testified that this change of the repurchase date for the real property was made at the insistence of Debtor, who wanted a longer period to reacquire the property after it was deeded to Farm Credit.  He indicated that Farm Credit could not extend that period beyond December because it would require the first three months of 2009 to attempt to sell the property given that it was farm ground with a limited prime selling season.  Debtor's testimony was that Guenther was initially quite firm on the October date, but agreed to extend it to December 1 after he and his parents "begged" him to do so at the August 21 meeting.

MEMORANDUM OF DECISION - 14

2009, and Debtor would maintain insurance on it.

*Id.*

Following execution of this letter of understanding, Farm Credit received three communications from the Schiemers.  In a letter dated September 22, 2008, Melda Schiemer raised questions about the nature of Farm Credit's prior financing of Debtor and addressed the conveyance of the real estate in 2005.  Ex. 102.[16]  She indicated the Schiemers had discussed the matter with their attorney "this spring" and referenced a letter to that attorney dated April 24, 2008.  She also indicated concerns over the nature of the liquidation proposals discussed that fall, and she suggested it might be in their interest to talk to a bankruptcy attorney or senior officials with Farm Credit.

Guenther e-mailed a copy of this letter to Debtor on September 26, 2008, indicating a need to discuss the letter and informing Debtor that draft documents would be available for review in about a week.  *Id.*

On October 8, 2008, the Schiemers wrote another letter.  Ex. 103.  They were looking for copies of earlier correspondence, and they referenced the change of the "deadline" to December 1, apparently referring to the option period for repurchasing the real estate.  Guenther responded October 13.  *Id.*

---

[16]  Though the letter is also signed by George Schiemer, its text makes clear Melda wrote it.

MEMORANDUM OF DECISION - 15

Yet another letter was sent to Guenther by the Schiemers on October 17, 2008. Ex. 104. It raises questions about why Debtor deeded the real estate to the Schiemers (in 2005); why the repurchase date for the machinery is March 1, 2009 but for the real property is December 1, 2008; and other concerns. *Id.*

Guenther responded by letter on October 21, 2008. *Id.* In Guenther's response he explained that Farm Credit had not required or encouraged Debtor to deed the real estate to the Schiemers in 2005, though it did not object to that transfer occurring because it did not effect Farm Credit's security position. He also explained that there was no equity in the property at the time of the 2005 transaction given the real estate and operating debts secured thereby. Guenther reiterated that, as had been explained to the Schiemers' attorney, their personal liability to Farm Credit was limited to the real estate loan they had assumed (Loan #441), and did not extend to Debtor's other obligations, including Loan #141, though the real estate was collateral for those other obligations. Guenther also explained the reasoning behind the different option deadlines of December 1, 2008 and March 1, 2009.

In this same October 21, 2008 letter, Guenther stated:

We [Farm Credit] suggest that you consult with you[r] attorney regarding any legal issues or to answer your questions regarding this agreement or your obligation under the loan documents.

While we appreciate your interest in understanding how we got here and why Farm Credit is making the decisions we are, you must understand that all of this was explained in great detail to Rod and it

MEMORANDUM OF DECISION - 16

> was his obligation to explain it to you if he chose to. It was Rod who
> requested that you assume the Real Estate loan and it was Rod who
> deeded the property to you as part of a plan to secure additional
> operating financing from Farm Credit. . . .
>
> Rod and you have agreed in writing to this plan and now it is time to
> complete the deal. We expect you all to sign the documents presented
> and/or immediately deed the property back to Rod so our agreement
> can be completed by 10/31/08 or we will need to consider taking steps
> to enforce our agreement or begin the process to collect the loans.
>
> I plan to be in Ontario on 10/24/08 and would welcome a meeting with
> you, Rod and your attorney to discuss this plan. I have spoken to Rod
> today and sent a copy of this letter to him by E-mail. Rod informed me
> he would contact you and your attorney today to set up a time to meet.

*Id.* The cover e-mail from Guenther to Debtor indicated a meeting was planned

for Friday, October 24, 2008. *Id.*

On October 30, 2008, Farm Credit, Debtor, and the Schiemers each

executed a formal Loan Liquidation Agreement dealing with Loan #141, Loan

#146 and Loan #441. Ex. 1 (the "Agreement"). Generally consistent with the

August letter of understanding, the Agreement provided, *inter alia*:

– Debtor, contemporaneously with the Agreement, would execute and

deliver to Farm Credit a "bill of sale in lieu of foreclosure" as to all farm

equipment and machinery, irrigation equipment including a leased circle (pivot),

and farm vehicles. That property was specified on an attached exhibit. In return

for this conveyance, Debtor would receive a credit of $275,000 applied first to

Loan #141 and then to Loan #146. Provided no default under the Agreement

occurred, Debtor was given the ability to retain possession and use the equipment

MEMORANDUM OF DECISION - 17

specified in the bill of sale to March 1, 2009, but was to deliver it to Farm Credit by such date.  Debtor had to maintain insurance.  Debtor had the right to "repurchase" the personal property (other than a Zimmatic pivot) if such a repurchase closed and the funds were paid to Farm Credit not later than March 1, 2009.

   – The Schiemers, contemporaneously with the Agreement, would execute and deliver a deed in lieu of foreclosure on the Riverview and Booth parcels.  In return therefore, the Schiemers and Debtor would receive credit of $375,000, such credit applied first to Loan #441, then to Loan #141, and then to Loan #146.  So long as there was no default of the Agreement, Debtor and the Schiemers could remain in possession of the real estate and farm the same, including harvesting the 2008 crop, through December 1, 2008.  They were to surrender possession on that date unless they exercised a right of repurchase in the amount of $92,000 (for the Riverview parcel) and/or $342,000 (for the Booth parcel).[17]  In a provision printed in bold face and separately initialed by Debtor and the Schiemers, they waived statutory repurchase and lease rights in consideration of the express right of repurchase and the other covenants of the Agreement.

   – So long as the Agreement was not in default, Farm Credit agreed to release all 2007 crop proceeds to Debtor, who was to use such funds for payment

---

[17]   Repurchase of the Booth parcel required repurchase of the Zimmatic pivot as well.

MEMORANDUM OF DECISION - 18

of 2007 crop expenses and liens, and provide an accounting of such use.

– So long as the Agreement was not in default, Farm Credit agreed to release all 2008 crop proceeds to Debtor, who was to use such funds for payment of 2008 crop expenses and liens under an approved budget.  After payment of such expenses, Debtor was to pay the next $100,000 of the 2008 crop proceeds to Farm Credit for application to Loan # 141 and then Loan # 146.  Payment was due by March 1, 2009.

– With the transfers noted, Farm Credit agreed to reamortize the balance due on Loan # 146 at 0% interest, with annual $50,000 payments due starting March 1, 2010.  *Id.* at 2-4.

Among the other terms of the Agreement were a mutual release of all claims or causes of action in contract, tort or otherwise.  *Id.* at 6, ¶ V (B).  Debtor and the Schiemers also certified that they carefully read and understood the terms of the Agreement, did not rely on advice or statements of Farm Credit, and freely agreed to it.  They acknowledged that Farm Credit strongly recommended they consult with counsel and that, to the extent they had not done so, they were given the opportunity and chose not to consult an attorney.  *Id.* at 6, ¶ V (C).  Both these provisions were in bold face and separately initialed by Debtor and the Schiemers.[18]

---

[18]   Guenther also testified that he advised Debtor several times to consult with an
(continued...)

MEMORANDUM OF DECISION - 19

In accomplishing the terms of the Agreement, the Schiemers also executed on October 30, 2008, a Non-Merger Bargain & Sale Deed in Lieu of Foreclosure to the real property, which deed was recorded that same day.  Ex. 2.

On October 29, 2008, Debtor executed a Bill of Sale in Lieu of Foreclosure to Farm Credit regarding his farm equipment and machinery, in express consideration of a $275,000 credit toward obligations owed Farm Credit.  Ex. 4.  The equipment and other personal property was itemized, and it was transferred free and clear except for a financing lease on the Zimmatic pivot to Farm Credit Leasing and purchase money security interests on two tractors, an onion loader, and a forklift.

Farm Credit did credit Debtor's loans as contemplated by the Agreement.  Guenther testified that Loan #441, the real estate loan assumed by the Schiemers, was paid off.  Loan #141 was also credited and paid off.  *See*, *e.g.*, Ex. 15 (reflecting a $0 balance on Loan # 141).[19]  Loan #146 still had an outstanding

---

[18](...continued)
attorney, even suggesting it be a "bankruptcy lawyer."  He was not aware if Debtor did so. Debtor testified that Guenther did make these suggestions.  Further, Debtor admits that he contacted and met with a Vale, Oregon lawyer and an Idaho bankruptcy lawyer *prior* to the execution of the final Loan Liquidation Agreement of October 30, 2008.  Debtor indicates the bankruptcy lawyer was familiar only with "credit card bankruptcies" and was of little help, after which Debtor was "discouraged" and consulted with no other counsel.  He was referred to his current chapter 12 lawyer, but consulted with him only *after* executing the Loan Liquidation Agreement and related documents.

[19]   The credited amounts, per Guenther, were $123,710 on Loan # 441, and $464,261 on Loan # 141.  *See* Ex. 16 (balances calculated as if the Agreement had not occurred, thus reflecting magnitude of credit).

MEMORANDUM OF DECISION - 20

balance after a credit Guenther estimated at approximately $70,000, and that

balance was $434,443 as of the petition date. Ex. 15.[20]  In addition, pursuant to

the Agreement, Farm Credit signed off on the 2008 crop proceeds which Guenther

estimated amounted to over $300,000 after the October, 2008, execution of the

Agreement.  The Agreement conditioned such releases on provision of monthly

accountings by Debtor, though Guenther indicated Farm Credit received only one

report in December, 2008.

**DISCUSSION AND DISPOSITION**

Debtor filed a voluntary petition for Chapter 12 relief on February 13,

2009.  Farm Credit brought its motion for relief from stay, Doc. No. 18 (the

"Motion"), on February 25, 2009.  Though providing Debtor with the notice of an

opportunity to object and request a hearing, as contemplated by this District's

LBR 4001.2, *see id.* at 5, Farm Credit also sought to set its own hearing on the

Motion, claiming that extraordinary circumstances supported such relief.  *See* Doc.

Nos. 20, 21.  The Court agreed, and allowed a hearing to be noticed for March 11,

2009.  Doc. No. 24 (order).  Hearing on the Motion was held that date, at which

time the parties presented the evidence outlined in the Court's findings of fact

above.

Debtor raises several preliminary procedural issues to the Court's

---

[20]  This was the loan that was to be termed out at 0% interest with $50,000 annual
payments commencing in March, 2010.

MEMORANDUM OF DECISION - 21

consideration of the Motion on the existing record.  Upon careful consideration, the Court concludes none are persuasive.

### A.      That Farm Credit scheduled the hearing was not improper

LBR 4001.2 does not prohibit a creditor from seeking leave to schedule a hearing rather than await a debtor's objection.  LBR 4001.2(e)(1)(A) provides "Upon court approval, the movant may schedule a hearing for cause shown in the motion or other submissions."  The Court here allowed the scheduling of a hearing on shortened notice by Farm Credit.  Doc. No. 24.  In the Court's view, the allegations in the Motion concerning the prebankruptcy transfer of the subject real estate by a deed to Farm Credit recorded in 2008, and the allegations that the property prior to such transfer was held not by Debtor but by non-debtors, the Schiemers, formed an adequate basis for a prompt, creditor-set hearing. Allegations regarding Debtor's conveyance in 2008 of the machinery and equipment to Farm Credit by bill of sale, prior to the February 13, 2009 bankruptcy, also formed an adequate basis for a prompt, creditor-set hearing. Finally, Farm Credit supported by declaration its contentions that a prompt hearing was necessitated by the need to address sale of its agricultural real property in the early spring.

Nothing in the submissions on March 11, 2009, causes the Court to second-guess that decision to allow Farm Credit to set a hearing.  To the extent Debtor's objection to that approach is still urged, it is overruled.

MEMORANDUM OF DECISION - 22

### B. That the hearing on March 11, 2009, was evidentiary is not improper

Debtor correctly notes that, usually, this District's preliminary hearings under § 362(e) are limited to representations by the parties' attorneys as to what factual issues exist and the nature of evidence to be presented at a final hearing. *See*, *e.g.*, LBR 4001.2(e)(2), (e)(3). However, the Court retains discretion in the application of its local rules to allow an evidentiary § 362(e) preliminary hearing. First, there is no absolute prohibition of such an approach in the rules themselves. *See* Fed. R. Bankr. P. 1001 ("These rules shall be construed to secure the just, speedy, and inexpensive determination of every case and proceeding."); LBR 1001.1, at Adv. Comm. Note ("These local rules are subject to clarification and interpretation by the courts of this district.") And, while this Court has found that, in most situations, the approach adopted in LBR 4001.2(e)(2) has value and allows the Court to appropriately evaluate motions and determine if a final hearing is required and, if so, on what procedural conditions, it is not unalterably the case.

Further, the Code contemplates that a preliminary hearing may be combined with a final hearing. *See* § 362(e) ("A hearing under this section may be a preliminary hearing, or may be consolidated with the final hearing under subsection (d) of this section.") And any hearing under the Rules may be evidentiary in nature if there are disputed issues of fact. *See* Fed. R. Bankr. P. 9014(d) ("Testimony of witnesses with respect to disputed material factual issues

MEMORANDUM OF DECISION - 23

shall be taken in the same manner as testimony in adversary proceedings."); *see also* Fed. R. Bankr. P. 4001(a)(1) (providing that a motion for relief from the automatic stay shall be made in accordance with Rule 9014).

It was within the Court's discretion to hear evidence at the preliminary hearing. Both Farm Credit and Debtor provided LBR 9014.1 notices of their intent to provide testimony at the March 11 hearing. *See* Doc. Nos. 33, 34. In addition, both parties provided witness and exhibit lists. *See* Doc. Nos. 31, 36. There was no surprise that the March 11 hearing was evidentiary, and both Farm Credit and Debtor were allowed ample opportunity at hearing to present testimony and documentary evidence in regard to the stay lift contentions.

Consequently, there was no error in procedure, and any objection thereto is overruled.

### C. The contentions advanced by Farm Credit do not mandate an adversary proceeding

Debtor contends that the stay relief approach advocated by Farm Credit is improper in that it seeks relief that must instead be pursued through an adversary proceeding. *See* Doc. No. 32 (objection). While not extensively articulated, it appears Debtor believes the Motion asks the Court to adjudicate the nature of the interests of Farm Credit and Debtor in property, or to allow Farm Credit to gain possession of the same, either of which would fall within the ambit of Fed. R. Bankr. P. 7001.

MEMORANDUM OF DECISION - 24

Rule 7001(1) requires that "a proceeding to recover money or property" (with certain exceptions not relevant here) requires an adversary proceeding. And Rule 7001(2) indicates that "a proceeding to determine the validity, priority, or extent of a lien or other interest in property" (also with an exception irrelevant here) is to be in the form of an adversary proceeding. The Court concludes neither requires the instant Motion be denied or Farm Credit forced to refile in another manner.

Farm Credit asks for only one form of relief – termination of the automatic stay of § 362(a), to the extent it exists. Admittedly, Farm Credit does plead a threshold fact in support of obtaining that relief. It alleges that Debtor does not own the real property, because (a) it was owned since 2005 by the Schiemers and (b) on October 30, 2008, the Schiemers deeded that property to Farm Credit. Why, then, is there a stay issue? Farm Credit explains that:

> On the petition date, Farm Credit received correspondence from the debtor's counsel . . . alleging that the automatic stay prevented Farm Credit from further efforts to market the Real Property. Farm Credit respectfully disagrees, but nonetheless files this motion seeking relief from the stay as to the Real Property."

Motion at 3.[21]

A party seeking relief from stay, whether to enforce a security agreement in property that is conceded to be property of the estate or to enforce claims against

---

[21] The letter from Debtor's counsel is attached to the Motion as Ex. F, and it states Debtor "claims an interest in the real property" that is described on an attachment to that letter.

MEMORANDUM OF DECISION - 25

property that is allegedly not property of the estate at all, must assert the nature of

the interests in the property and be in a position to prove those assertions at a stay

relief hearing.  *See* LBR 4001.2(b) (listing the information required for every stay

relief motion including the obligation to "identify the nature of the stay relief

sought" and to "provide the details of the underlying obligation or liability upon

which the motion is based").  If doing so invoked the "determin[ation] of the

validity . . . or extent of . . . an interest in property" component of Rule 7001(2),

there would be few motions for stay relief that would not require an adversary

proceeding.  Debtor's contentions are overly strained.

        Nor is the instant motion a proceeding "to recover . . . property" under Rule

7001(1).  Farm Credit seeks elimination of the automatic stay.  If granted, any

recovery of property or exercise of rights would presumptively occur in another

court under applicable non-bankruptcy law.  Farm Credit asks this Court for no

such relief.

        To be sure, there may be an adversary proceeding looming somewhere.

Debtor has argued that the transfer of the real property by his deed to his parents

in 2005 was somehow improper.  He asserts that Farm Credit failed to provide a

"distressed loan letter" in 2005.  He contends that the deed was prepared by and

required by Farm Credit.  He seems to contend that his execution of the deed and

its recording, though over three years earlier, should not be given the effect that

would normally attend under applicable non-bankruptcy law.  In part, this is based

MEMORANDUM OF DECISION - 26

on theories that either Debtor or the Schiemers acted under "duress" in 2005 and/or 2008, or that Farm Credit somehow violated the Agricultural Credit Act of 1987 in the "Assumption Agreement" of 2005.[22]

Under the evidence presented at the § 362(d) and (e) hearing, these various arguments and contentions were not proven. Under the evidence, Farm Credit is the owner of the real estate, having received it in 2008 from the Schiemers, who were the owners since Debtor's warranty deed was recorded in 2005. To change that state of affairs requires Debtor's successful prosecution of an adversary proceeding, not one by Farm Credit to validate what the documentary evidence and testimony supports.

**D.    Farm Credit is entitled to relief from the automatic stay in regard to the real property, if the stay applies at all**

Upon the evidence presented, Debtor's interest in the real property is limited solely to a holdover possession under the Agreement. *See* Ex. 1 at 3, ¶ 1(C)(2) (granting "Borrowers," a term defined as including both Debtor and the Schiemers, the right to remain in possession of the real property in 2008 for farming purposes, so long as they are not in default under that Agreement, but only through December 1, 2008 in any event.) When the right of repurchase was not exercised in accord with the Agreement by December 1, 2008, Debtor and the

---

[22]   Debtor had initially intimated that a claim of fraudulent transfer would attend the 2005 transfer of Debtor's property to the Schiemers. That contention was abandoned by Debtor at hearing on the basis that, given the amounts of the debts against the real property at the time, there was no equity of Debtor therein for which he did not receive reasonably equivalent value.

MEMORANDUM OF DECISION - 27

Schiemers had no remaining interest, The agreement required that they "shall surrender possession of the real property upon demand." *Id.*[23]

On the evidence, the real property is not property of the estate. The repurchase right – which required performance by payment of funds in specified amounts not later than December 1, 2008 – had lapsed. Thus that right is also not property of the estate.

The stay does enjoin attempts to obtain possession of property of the estate or exercise control over property of the estate. *See* § 362(a)(3). But that provision is not implicated here because the real property is not property of the estate. Farm Credit was nevertheless concerned because Debtor purported to claim some interest. *See* Motion at Ex. F; *see also* Doc. No. 48 at sched. A (claiming a "fee simple" interest in the Booth parcel subject to Farm Credit's lien and claiming a "fee simple" interest in the Riverview parcel).[24] It therefore filed this Motion.

The Court concludes that, *if* the stay applied because of holdover possession or the threatened litigation by Debtor to recast the prior transfers, Farm Credit is nonetheless entitled to relief. Under § 362(g)(1), the moving party on a

---

[23] One might argue that the Agreement effectively gave a "lease" of the real property to Debtor for the 2008 crop year. However, the right to possess and use the property ended on December 1, 2008, by virtue of the parties' express agreement. Under § 362(b)(10), the stay does not apply to a lessor taking acts against a debtor to recover possession of property under a lease of nonresidential real property that has terminated by reason of the expiration of its stated term before commencement of the case. The real property in question is nonresidential agricultural land.

[24] Debtor's schedules were filed after the Motion, and two days before the hearing.

MEMORANDUM OF DECISION - 28

stay relief request is required to prove the lack of debtor's equity in property. Farm Credit carried that burden.[25]  The burden of proving all other issues in a stay relief contest is on the party opposing relief, here Debtor.  He failed to carry that burden.

Given the evidence, including the lack of ownership interest of Debtor in the real property, cause exists for relief.  Farm Credit's Motion will be granted as to the real property.  This relief extends to the irrigation pivot on the real property which, under the Agreement and the other documents discussed above, is affixed to and treated by the parties as part and parcel of the real property.

### E.    A further hearing on stay relief is required as to the machinery and equipment

The issues are similar, though not identical, with regard to the machinery and equipment.  The similarity arises from the Agreement under which Debtor gave a bill of sale in lieu of foreclosure to Farm Credit in connection with this described equipment.  He has already received credit against his obligations for doing so.[26]

The difference, however, has to do with timing.  Debtor was, under the

---

[25]  Farm Credit established the absence of Debtor's equity because the real property was owned by Farm Credit under the recorded 2008 deed in lieu of foreclosure, for which Debtor and his parents were given credit including satisfaction in full of the loan previously secured by that property.

[26]  And, as noted, he has also received the benefit of the Agreement in having Farm Credit release several hundred thousand dollars of crop proceeds, which otherwise secured Farm Credit.

MEMORANDUM OF DECISION - 29

Agreement and related documents, allowed to retain possession of and use the machinery, and was not required to deliver possession until March 1, 2009. The bankruptcy filing of February 13, 2009, preceded this date.

The Court concludes that further hearing, and briefing by the parties, is required in order to deal with the questions surrounding the equipment. At the March 11 hearing, there were a number of theories advanced as to how the agreement that Debtor could use the equipment until March 1, 2009, and repurchase it by such date, should be construed in this bankruptcy case. Concepts like executory contract under § 365, or tolling of obligations under § 108(b), were mentioned. The Court requires better clarity of reasoning and exposition than it has received as yet on this subject.[27]

While additional hearing will be required, the Court does not agree with Debtor that such hearing on stay relief must await adversary proceeding litigation to "recharacterize" the October, 2008 transfer of the equipment. Debtor argued at hearing that the bill of sale should be viewed as a security agreement, and Farm Credit's present rights in the equipment should be viewed or construed as a lien,

---

[27] This is not to say that the theories are problem-free. For example, rights under an executory contract can be assumed but doing so requires cure of default or adequate assurance of prompt cure, compensation of pecuniary loss to the non-debtor party, and adequate assurance of future performance. *See* § 365(b)(1)(A)-(C). Debtor has not adequately addressed these preconditions. And if § 108(b) provides a tolling of the duty to perform the repurchase, that section appears to limit the extension of the deadline to the later of its natural expiration or 60 days after the order for relief, which here would extend the deadline to approximately April 11, 2009.

MEMORANDUM OF DECISION - 30

which Debtor may propose to treat under § 1225(a)(5) in his anticipated Chapter 12 plan.  He argues that this is akin to precedent addressing the treatment of certain leases as "true leases" or security agreements, or the recasting of absolute deeds to real property as mortgages.

The Court disagrees, and views the evidence as clear that Farm Credit previously had a security interest in all the equipment, and is now its owner.  As part of a detailed and carefully drawn agreement in 2008, Debtor surrendered all his interests in this personal property in satisfaction of certain debts secured thereby and, indeed, he received the bargained-for credit against those debts.  Based on the evidence presented, Debtor's remnant right was merely (a) to possess and use the equipment in his operations from the date of the agreement in October, 2008 through March 1, 2009, and (b) to buy the personal property from its owner, Farm Credit, no later than March 1, 2009 by tender of cash in the amounts shown in the Agreement.  *See* Ex. 1.

The equipment is the property of Farm Credit, not the Debtor, under the evidence before the Court.  Conclusion of the stay relief process is necessary only to address the issues surrounding the timing of the filing of the chapter 12 case two weeks before the repurchase option deadline.  An adversary proceeding is not prerequisite.

## CONCLUSION

The Motion will be granted as to the real property on the foregoing findings

MEMORANDUM OF DECISION - 31

and conclusions and for the reasons stated.  Farm Credit shall submit a proposed

Order.

      The Motion, as to the equipment, will be set for a further hearing on April

2, 2009, commencing at 1:30 p.m.  A separate notice of hearing will be issued by

the Court.

DATED: March 19, 2009



TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 32